AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

### for the

### Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>**Information associated with Facebook User ID#**<br>**100066013036816 that is stored at premises controlled**<br>**by Facebook** | )<br>)<br>)<br>)<br>)<br>)    Case No.   '21  MJ4812 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A-3, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B-3, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1591, 2421 | Sex trafficking by force, fraud, or coercion; Transportation for Prostitution |

The application is based on these facts:

See Attached Affidavit of Special Deputy USM Michelle Storms, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Michelle Storms, Special Deputy United States Marshal**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*

Date: _____ 12/09/2021 _____

_____
*Judge's signature*

City and state: San Diego, California

**Hon. Andrew G. Schopler, U.S. Magistrate Judge**
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Michelle Storms, Special Deputy United States Marshal, being duly sworn, hereby state as follows:

### INTRODUCTION

1. I make this affidavit in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) for information associated with the following Facebook user Accounts (collectively referred to herein as the "**Target Accounts**") for the period from June 1, 2021 to August 1, 2021:

      a. Christine Mckinney
        User ID# Christine.mckinney.1401

        ("**Target Account #1**")

      b. Ashton Jordan
        User ID# Ashton.jordan.1291

        ("**Target Account #2**")

      c. John Wick
        User ID# 100066013036816

        ("**Target Account #3**")

These accounts are stored at the premises owned, maintained, controlled, or operated by Facebook, 1601 Willow Road, Menlo Park, California 94025, more fully described in Attachments A-1, A-2, and A-3.

2. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence exists within the **Target Accounts** related to violations of federal law, including violations of 18 U.S.C. 1591 (Sex Trafficking by Force, Fraud, and Coercion), and 18 U.S.C. 2421 (Transportation for Purposes of Prostitution), as more fully described in Attachments B-1, B-2, and B-3.

3.     The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target Accounts**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

4.     I am a Deputy Sheriff for the San Diego County Sheriff's Department. I have been a Deputy Sheriff since January of 2011. I am currently assigned to the San Diego Human Trafficking Task Force (SDHTTF) as a Task Force Officer (TFO), where I assist in the investigation of crimes concerning child exploitation and human trafficking. I have been assigned to this unit since May 2021. I was cross sworn with the United States Marshal's Service on August 10, 2021.

5.     My experience as a Deputy Sheriff has included the investigation of cases involving the use of computers and the Internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

6.     I have become familiar with Facebook and other social media sites through my investigations. I have examined many Facebook profile pages and I

1   have learned that suspects often use social media sites for communications in an
2   effort to bypass law enforcements attempts to uncover their criminal activity. Based
3   on my training, experience, and communications with other law enforcement
4   officers, I have learned specific techniques in being able to identify suspects and
5   associates even when they use fictitious names or aliases within social media sites.
6   Through my training, experience, and consultation with other law enforcement
7   officers, I have learned that:

8          a.      Individuals involved in illicit commercial sex maintain records,
9   including electronic files, related to their illicit business on computers and computer
10  servers hosting internet applications such as electronic mail (email) and personal
11  social networking web pages;

12         b.      Individuals involved in illicit commercial sex maintain records
13  of correspondence relating to client contact information as well as travel and lodging
14  arrangements involved in such illegal activity;

15         c.      Individuals involved in illicit commercial sex maintain
16  documents and files containing names of associates and/or coconspirators involved
17  in prostitution;

18         d.      Individuals involved in illicit commercial sex maintain financial
19  records, bank statements, money orders, money order receipts, and cash that are
20  evidence of payments made in conjunction with prostitution;

21         e.      Individuals involved in illicit commercial sex use social media
22  sites like Facebook to find clients and prostitutes. They use Facebook messaging
23  applications to communicate with prostitutes and customers to increase their
24  mobility and coordinate illicit activities. They will often use multiple social media
25  accounts in order to maintain contact with other pimps, prostitutes, complicit
26  businesses, and clients. These social media accounts contain electronic data
27  concerning instant messaging, electronic mail and social media addresses of co-

3

1   conspirators and clients, as well as contact information for co-conspirators and
2   clients. Individuals involved in illicit commercial sex also utilize social media to
3   store and display, commonly known as posting, photographs, videos, and text of
4   themselves as well as other coconspirators for the purpose of electronic advertising
5   and promotion of prostitution.

6         7.    Based upon my experience and training, and the experience and training
7   of other agents with whom I have communicated, the evidence of illegal activity
8   described above in paragraphs "a" through "e" is maintained by individuals involved
9   in illicit commercial sex in property that they and their associates live in and operate
10  as well as on online accounts, including Facebook accounts, which can be accessed
11  on computers and cellular telephones.

12  **BACKGROUND INFORMATION ON FACEBOOK**

13        8.    Facebook is a corporation that owns and provides a free-access online
14  social networking service and is headquartered in Menlo Park, California.
15  Facebook allows its users to establish accounts with Facebook, and users can then
16  use their accounts to share written news, photographs, videos, and other information
17  with other Facebook users, and sometimes with the general public.

18        9.    Facebook asks users to provide basic contact and personal identifying
19  information to Facebook, either during the registration process or thereafter. This
20  information may include the user's full name, birth date, gender, contact e-mail
21  addresses, Facebook passwords, Facebook security questions and answers (for
22  password retrieval), physical address (including city, state, and zip code), telephone
23  numbers, screen names, websites, and other personal identifiers. Facebook also
24  assigns a user identification number to each account.

25        10.    Facebook users may join one or more groups or networks to connect
26  and interact with other users who are members of the same group or network.
27  Facebook assigns a group identification number to each group. A Facebook user

1   can also connect directly with individual Facebook users by sending each user a
2   "Friend Request." If the recipient of a "Friend Request" accepts the request, then
3   the two users will become "Friends" for purposes of Facebook and can exchange
4   communications or view information about each other. Each Facebook user's
5   account includes a list of that user's "Friends" and a "News Feed," which highlights
6   information about the user's "Friends," such as profile changes, upcoming events,
7   and birthdays.

8       11.   Facebook users can select different levels of privacy for the
9   communications and information associated with their Facebook accounts. By
10  adjusting these privacy settings, a Facebook user can make information available
11  only to himself or herself, to particular Facebook users, or to anyone with access to
12  the Internet, including people who are not Facebook users. A Facebook user can
13  also create "lists" of Facebook friends to facilitate the application of these privacy
14  settings. Facebook accounts also include other account settings that users can adjust
15  to control, for example, the types of notifications they receive from Facebook.

16      12.   Facebook users can create profiles that include photographs, lists of
17  personal interests, and other information. Facebook users can also post "status"
18  updates about their whereabouts and actions, as well as links to videos, photographs,
19  articles, and other items available elsewhere on the Internet. Facebook users can
20  also post information about upcoming "events," such as social occasions, by listing
21  the event's time, location, host, and guest list. In addition, Facebook users can
22  "check in" to particular locations or add their geographic locations to their
23  Facebook posts, thereby revealing their geographic locations at particular dates and
24  times. A particular user's profile page also includes a "Wall," which is a space
25  where the user and his or her "Friends" can post messages, attachments, and links
26  that will typically be visible to anyone who can view the user's profile.
27

13.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

14.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

15.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

16.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

17.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

6

18.   Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

19.   Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services.

20.   The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

21.   Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

22.   In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

23.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user

7

identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

24.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

25.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.   Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

26.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook can

indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

27. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

1

## FACTS IN SUPPORT OF PROBABLE CAUSE

2

28.    On July 11, 2021, TFOs from the SDHTTF interviewed a 21-year-old

3

woman (AF) at Scripps Mercy Hospital, who was being treated for pain in her

4

knee, scratching, and bruising on her body. During that interview, AF told TFOs

5

that she met "Greedy" or "Jordan" (later identified as Ashton Tylon Amir

6

JORDAN) in Las Vegas, Nevada, in mid-June 2021, when he recruited her to work

7

for him as a prostitute. Shortly thereafter, he drove her to Phoenix, Arizona to

8

continue to perform commercial sex acts. The week of July 8, 2021, he flew her to

9

San Diego, California to continue to engage in commercial sex. (In a later

10

interview, AF clarified that she and JORDAN had driven to San Diego from

11

Phoenix.)  AF stated that JORDAN took her two cell phones, numbers: 323-603-

12

8800 and 424-328-9118, and used them to post commercial sex advertisements of

13

her on various online websites, including megapersonals.com (MP)[1]. JORDAN did

14

not let AF post her own advertisements on MP, although he occasionally let her

15

post her advertisements on another website skipthegames.com (SG)[2]. AF

16

explained that JORDAN had "rules" for her including but not limited to: she was

17

to keep her head down and not speak with other African-American males; she had

18

to give him all the money she made from a commercial sex transaction

19

immediately; and she had to walk in front of him when they walked together. If

20

AF did not follow the rules, she stated that JORDAN would slap or punch her

21

body. She was required to earn $1,800 each day, and she did not get any days off.

22

AF stated that JORDAN bought himself clothes with the money she made. She

23

stated that JORDAN kept all the money she earned from commercial sex

24

encounters, and that he controlled what she ate, drank, and bought. In particular,

25

26

27

---

[1] In my training and experience, I am familiar with megapersonals.com, which is a website operating in interstate commerce that is used to post advertisements offering commercial sex.
[2] In my training and experience, I am familiar with skipthegames.com, which is a website operating in interstate commerce that is used to post advertisements offering commercial sex.

AF stated that during her time with JORDAN in San Diego, he did not let her eat. According to AF, JORDAN had been violent with AF throughout the month she was with him, but she did not leave him in Arizona because she had no money or transportation, and she was not familiar with the area. JORDAN was mostly violent with AF when her family or friends contacted her.

29.    AF related that on July 10, 2021, she had used her "trap" phone[3] to text family members. She told them she was not happy and wanted to leave. JORDAN later saw those text messages and while inside room #117 of the Baymont Hotel[4], he punched her multiple times all over her body. Then, while she was on the bed, JORDAN got on top of her, and held a pocket knife to her throat, and told her he was going to kill her. According to AF, she pleaded with him to stop, and he eventually got off of her. A short time later, they were outside of the hotel room sitting on steps when she told him to just let her leave if he doesn't like her. JORDAN had previously threatened AF that if she left him, once he saw her, he would kill her. Upon her saying this, according to AF, JORDAN then struck her on the side of the head.   AF quickly stood up, and while barefoot with no belongings, she ran away from JORDAN. She reported that she ran to the lobby of the Baymont Hotel but it was locked. She ran to Ash Street and asked people for help, but they did not help her. She continued to run to a nearby Days Inn Hotel, located at 833 Ash Street, where she ran to the lobby, told the manager JORDAN was going to kill her, and begged him to let her inside. There, the manager told her to leave and locked the doors. AF reported to TFOs that she feared JORDAN had followed her, so she hid behind bushes and an ice machine until she ran into a guest

---

[3] In my training and experience, I am aware that individuals working in commercial sex will often have multiple cell phones. One is sometimes referred to as a "trap" phone and is used to communicate with sex buyers.
[4] The Baymont Hotel is located at 719 Ash Street, San Diego, California, in the Southern District of California.

at the hotel in room #406, who let her in and called 911.  San Diego Police Department (SDPD) Officers responded to the scene. AF told them what had happened, and she was transported to Scripps Mercy Hospital for treatment for her injuries. At the hospital, she told the staff what had happened.

  30. After obtaining AF's statement, TFOs took photographs documenting her injuries.  She had abrasions on her elbows, hands, and both knees, and bruises on her right buttock and left ribcage. TFOs also contacted Baymont Hotel. They learned that JORDAN had already checked out and had taken all personal belongings from inside the room with him, including AF's cell phones. Baymont Hotel provided TFOs with the registry for the room, which confirmed that room #104 had been rented by JORDAN on July 9, 2021 and that on July 10, 2021 he had switched to room #117. A later review of hotel surveillance footage showed JORDAN and AF in the lobby of the Baymont Hotel together on July 9, 2021, checking in. Additional surveillance from cameras facing room #117 revealed that on July 10, 2021[5], multiple men entered and exited the room during JORDAN and AF's stay. TFOs observed repeated instances of JORDAN leaving room #117, followed minutes later by an unknown male arriving. After the unknown males were observed exiting, JORDAN was then observed returning to the room. For example, on July 10, 2021, between 1:30 p.m. and 4:30 p.m., three men entered room #117 and then exited within 15 minutes. In each instance, JORDAN exited the room within minutes prior to the unknown males arriving, and positioned himself partially hidden in stairwells, but with a view of the parking lot. JORDAN watched as the males left and when they walked out of view of the camera, usually

---

[5] In viewing the video surveillance facing room #117, TFOs realized that the date/time stamp of the video appears to be approximately 12 hours fast. (They determined this based on the visible daylight in the video, as well as the timing of AF and JORDAN's check-in to the hotel and AF's flight from the hotel/contact with law enforcement.) Times and dates stated herein reflect TFO's corrections—for example, the surveillance footage stamped "July 11, 2021, 01:30:00" is in reality July 10, 2021, at approximately 13:30.

within minutes, he went back to room #117[6]. Surveillance footage from the night of July 10, 2021, also captured JORDAN striking AF on the head just before 10:00 p.m. on July 10, 2021. TFOs observed on the video that AF then ran away, and JORDAN chased after her. TFOs also reviewed surveillance footage from the Days Inn Hotel at 833 Ash Street. That footage showed AF running to the parking lot at approximately 10:07 p.m. Although the footage contains no audio, TFOs relayed that AF appeared distressed and scared, and appeared to have pleaded with the manager to let her into the lobby. They observed her then run to some bushes looking scared and upset, before going to the fourth floor and hiding behind an ice machine. AF was observed banging on the door to room #407 crying and screaming. The guests did not let her in. Eventually, some guests walked by and entered room #406 and let AF in until SDPD arrived.

31.    TFOs located multiple online commercial sex advertisements on MP, in San Diego, California containing photographs of AF. The phone number associated with the advertisements, 323-603-8800, is the same number that AF provided for JORDAN. Law enforcement database checks further confirmed that that phone number was registered and owned by JORDAN. TFOs also located multiple online commercial sex advertisements on both MP and SG where the number associated with the advertisements was AF's, 424-328-9118. The SG advertisements using AF's number were posted on May 22, 2021 and June 12, 2021, in Las Vegas, Nevada. Those advertisements used the same photographs. On June 15, 2021, around the time that AF estimated she began working for JORDAN, a new advertisement was posted on MP out of Las Vegas, with new photographs and a new name for AF, "China". A few days later, that same advertisement

---

[6] Based on my training and experience, I know that this is consistent with the role that a trafficker would play, staying nearby to ensure that the commercial sex encounter is successful and returning at its conclusion to collect the money.

appeared in Phoenix, AZ. The first advertisement in San Diego, California, which was associated with JORDAN'S phone, was located on MP dated July 8, 2021.

32.   AF was shown a photographic line up and identified the picture associated with JORDAN as the individual who brought her to San Diego and forced her to engage in commercial sex.

33.   A few days after AF ran away and contacted law enforcement, AF's social media accounts, all of which were accessible from her cell phone, which was in the possession of JORDAN, appeared to have been hacked. Sexually explicit videos depicting AF and JORDAN together were sent to several of the contacts in her friend lists on Snapchat, Instagram, and Facebook Messenger. AF attempted to change her passwords, but each time, the passwords were reset through her email account, which was also accessible from her cell phone. The social media messages thus continued.

34.   On July 17, 2021, TFOs met with AF at the San Diego Airport. AF showed TFOs messages from her Snapchat account that had been "screenshot" (a picture taken of the image displayed on the screen of a cellphone) and sent to her. The message was from a friend of AF, in response to a picture of AF and JORDAN together. It was a supportive message explaining that she (AF's friend) had left a similar situation and told AF she could do better. According to AF, JORDAN sent that screenshot message to AF at her Facebook messenger account (Christine.mckinney.1401, **Target Account #1**), via his Facebook Messenger account (Ashton.jordan.1291, **Target Account #2**) and said, "Oh yeah huh". JORDAN then sent the screenshot message again and said "Keep it up." According to AF, she did not reply to JORDAN's messages. She believes that the only way JORDAN could have seen those messages was by logging into AF's Snapchat account.

35.   AF also advised TFOs that someone using a Facebook account named "John Wick," with a Facebook ID: 100066013036816 (**Target Account #3**), had

14

messaged her Facebook Messenger account. The message said "You better pray on your kids you never see me P." This Facebook account did not have a picture, and only had one friend, but it stated the user currently lived in Phoenix, Arizona[7] and was from Los Angeles, California. AF told TFOs that she believed it was JORDAN because she had blocked his other account, and he had threatened her before if she ever left him, he would kill her.

36.    Later that evening, AF sent TFO Storms a screenshot of a message she believed JORDAN sent to one of her Snapchat friends, stating "Bd Weirdo Ass," via her account. The photograph sent appeared to be a screenshot of what looked like a sexually explicit video of AF performing oral sex. AF stated thereafter she deleted her Snapchat account.

37.    On July 20, 2021, AF sent TFO Storms a screenshot of her Facebook Messenger account (**Target Account #1**). She claimed that JORDAN had gotten into her account and changed her password again. JORDAN messaged her, from her own account, a "Kissy Face" and a "Thumbs Up" emoji. AF messaged back, told him to, "Get off her Shit" and asked him what her password was. She accused JORDAN of changing it and he denied it.

38.    Based on the facts above, there is reason to believe that JORDAN engaged in commercial sex trafficking of AF. There is also reason to believe JORDAN used **Target Accounts # 2 and 3** to send threats and sexually explicit videos to AF and her associates through her social media accounts.

39.    Based on my training and experience, and consultation with law enforcement agents who have training and experience investigating sex trafficking offenses, I know that individuals will often utilize multiple social media accounts to communicate with customers and individuals involved in prostitution.  Similarly,

---

[7] JORDAN's Department of Motor Vehicle information, as well as the address associated with the account for Target Phone #1, list a home address in Phoenix, Arizona.

1   multiple social media accounts are commonly used to make contact with minors and
2   adults to persuade and induce them into engaging in sex trafficking by
3   communicating using Facebook as described above. Based on the facts of this case,
4   I believe that evidence exists within the **Target Accounts** related to violations of
5   federal law, including violations of 18 U.S.C. 1591 (Sex Trafficking by Force,
6   Fraud, and Coercion), and 18 U.S.C. 2421 (Transportation for Purposes of
7   Prostitution). Additionally, the search of the **Target Accounts** may also identify
8   other individuals engaged in sex trafficking.

## PROCEDURES FOR ELECTRONICALLY STORED
## INFORMATION

11       40.    Federal Agents, cross-designated Task Force Officers and investigative
12   support personnel are trained and experienced in identifying communications
13   relevant to the crimes under investigation. The personnel of Facebook (hereinafter
14   "the internet service provider" or "the ISP") are not. It would be inappropriate and
15   impractical for federal agents to search the vast computer network of the ISP for the
16   relevant accounts and then to analyze the contents of those accounts on the premises
17   of the ISP. The impact on the ISP's business would be severe.

18       41.    Therefore, I request authority to seize all content, including electronic
19   mail and attachments, stored instant messages, stored voice messages, photographs,
20   and any other content from the Facebook accounts, as described in Attachments B-
21   1, B-2, and B-3. In order to accomplish the objective of the search warrant with a
22   minimum of interference with the business activities of the ISP, to protect the
23   privacy of the ISP's subscribers whose accounts are not authorized to be searched,
24   and to effectively pursue this investigation, the Federal Bureau of Investigation seeks
25   authorization to allow the ISP to make digital copies of the entire contents of the
26   accounts subject to seizure. The copies will be provided to me or to any authorized
27   federal agent. The copies will be imaged and the images will then be analyzed to

1    identify communications and other electronic records subject to seizure pursuant to
2    Attachments B-1, B-2, and B-3.   Relevant electronic records will be copied to
3    separate media.   The original media will be sealed and maintained to establish
4    authenticity, if necessary.

5          42.   Analyzing the data to be provided by the ISP may require special
6    technical skills, equipment, and software.   It may also be very time-consuming.
7    Searching by keywords, for example, often yields many thousands of "hits," each of
8    which must be reviewed in its context by the examiner to determine whether the data
9    is within the scope of the warrant.   Merely finding a relevant "hit" does not end the
10   review process.   Keyword searches do not capture misspelled words, reveal the use
11   of coded language, or account for slang.   Keyword searches are further limited when
12   electronic records are in or use foreign languages. Certain file formats also do not
13   lend themselves to keyword searches.   Keywords search text.   Many common
14   electronic mail, database and spreadsheet applications, which files may have been
15   attached to electronic mail, do not store data as searchable text.  Instead, such data
16   is saved in a proprietary non-text format. And, as the volume of storage allotted by
17   service providers increases, the time it takes to properly analyze recovered data
18   increases dramatically. The ISP does not always organize the electronic files they
19   provide chronologically, which makes review even more time consuming and may
20   also require the examiner to review each page or record for responsive material.

21         43.   Based on the foregoing, searching the recovered data for the
22   information subject to seizure pursuant to this warrant may require a range of data
23   analysis techniques and may take weeks or even months.   Keywords need to be
24   modified continuously based upon the results obtained and, depending on the
25   organization, format, and language of the records provided by the ISP, examiners
26   may need to review each record to determine if it is responsive to Attachments B-1,
27   B-2, and B-3. The personnel conducting the examination will complete the analysis

1  and within ninety (90) days of receipt of the data from the service provider, absent
2  further application to this court.

3      44.    Based upon my experience and training, and the experience and training
4  of other agents with whom I have communicated, it is necessary to review and seize
5  all electronic communications that identify any users of the subject account(s) and
6  any electronic mails sent or received in temporal proximity to incriminating
7  electronic mails that provide context to the incriminating mails.

8      45.    All forensic analysis of the imaged data will employ search protocols
9  directed exclusively to the identification, segregation and extraction of data within
10  the scope of this warrant.

11                **GENUINE RISK OF DESTRUCTION OF EVIDENCE**

12      46.    Based upon my experience and training, and the experience and training
13  of other agents with whom I have communicated, electronically stored data can be
14  permanently deleted or modified by users possessing basic computer skills.  In this
15  case, only if the subject receives advance warning of the execution of this warrant,
16  will there be a genuine risk of destruction of evidence.  In addition, preservation
17  requests were sent to Facebook ordering the preservation of data associated with the
18  **Target Accounts**.

19                **PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

20      47.    The United States has viewed posts, photographs, and information from
21  public portions of the **Target Accounts**.  However, as explained above, not all the
22  information requested will be available through this method, particularly related to
23  Facebook Messenger information.

24                              **CONCLUSION**

25      48.    Based on the foregoing, I respectfully submit that there is probable
26  cause to believe that evidence, fruits, and instrumentalities of violations of 18 U.S.C.
27  §§ 1591 and 2421, as described in Attachments B-1, B-2, and B-3, are likely to be

found in the property to be searched, as described in Attachments A-1, A-2, and A-3.

Michelle Storms
Special Deputy
United States Marshal

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 9 day of December 2021.

HONORABLE ANDREW G. SCHOPLER
United States Magistrate Judge

19

## **ATTACHMENT A-3**

This warrant applies to information associated with the following Facebook user Accounts:

      a. John Wick

          User ID# 100066013036816

          (**"Target Account #3"**)

**Target Account #3** is currently stored at premises owned, maintained, controlled, or operated by Facebook LLC., a wholly owned subsidiary of Facebook Inc., a company headquartered at 1601 Willow Road, Menlo Park, CA 94025.

30

# **ATTACHMENT B-3**

I.      Service of Warrant

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files relevant to Attachment A-3 and copy them onto removable electronic storage media and deliver the same to the officer or agent.

II.     Information to be disclosed by Facebook, LLC

To the extent that the information described in Attachment A-3 is within the possession, custody, or control of Facebook, LLC, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, LLC, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Instagram, LLC is required to disclose the following information to the government for each account listed in Attachment A-3:

All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

All past and current usernames associated with the account;

The dates and times at which the account and profile were created, and the Internet Protocol ("IP") address at the time of sign-up;

All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

31

1   　　　All data and information associated with the profile page, including
2   photographs, videos, "bios," and profile backgrounds and themes;

3   　　　All communications or other messages sent or received by the account;

4

5   　　　All user content created, uploaded, or shared by the account, including any
6   comments made by the account on photographs or other content;

7   　　　All photographs, images, and video in the user gallery for the account
8   including Exchangeable Image File ("EXIF") data and any other metadata associated
9   with those photos and videos;

10  　　　All location data associated with the account, including geotags;

11

12  　　　All data and information that has been deleted by the user;

13  　　　A list of all of the people that the user follows on Facebook and all people
14  who are following the user (*i.e.*, the user's "following" list and "followers" list), as
15  well as any friends of the user;

16  　　　A list of all users that the account has "unfollowed" or blocked;

17

18  　　　All privacy and account settings;

19  　　　All records of Facebook searches performed by the account, including all past
20  searches saved by the account;

21

22  　　　All information about connections between the account and third-party
23  websites and applications; and,

24  　　　All records pertaining to communications between Facebook, LLC and any
25  person regarding the user or the user's Instagram account, including contacts with
26  support services, and all records of actions taken, including suspensions of the
27  account.

III.   Information to be seized by the government

The search of the data supplied by Facebook pursuant to this warrant will be conducted by the FBI or other law enforcement agent as provided in the "Procedures for Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of **June 1, 2021 to August 1, 2021**, and to the seizure of:

a. Communications, records, and attachments tending to discuss or establish the user of the account is engaged in sex trafficking and transportation for illegal sexual activity in violation of 18 U.S.C. §§ 1591 and 2421;

b. Communications, records, and attachments that provide context to any communications described above, such as messages sent or received in temporal proximity to any relevant activity on the account;

c. Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Instagram account owner;

d. Communications, records, and attachments tending to identify the owner of the Facebook account, and any co-conspirators involved in sex trafficking in violation of 18 U.S.C. § 1591 and 2421;

e. Evidence indicating the Facebook account owner's or co-conspirator's state of mind as it relates to the crime under investigation;

f. The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

g. Evidence tending to identify other facilities, storage devices, or services—such as email addresses, IP addresses, phone numbers–that may contain evidence of the efforts described in (a) and (b);

h. Evidence tending to identify co-conspirators, criminal associates, or others involved in the efforts described in (a) and (b);

i. Evidence tending to identify funding sources, bank accounts, and financing methods involved in the efforts described in (a) and (b);

j. Evidence tending to identify the user of, or persons with control over or access to, the Target Accounts;

33

k. Evidence tending to identify signs, writings, clothing, music, documents, articles of personal property, videos, communications, photographs, or other forms of media evidencing the existence of—or association with—a conspiracy to conduct racketeering enterprise affairs (human trafficking, financial crimes, and murder, kidnapping, robbery, or other forms of violent crime);

l. Evidence tending to indicate the account owner's state of mind as it relates to the crimes under investigation; and/or;

m. tending to indicate efforts to possess controlled substances with intent to deliver them;

n. tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers–used to facilitate the possession of a controlled substance for sale;

o. tending to identify coconspirators, criminal associates, or others involved in sale of controlled substances; or

p. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data described above.

**which are evidence of violations of Title 18 U.S.C. sections 1591 and 2421**

34